**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,
*Plaintiff*,

vs.

ANGEL URBINA,
*Defendant*.

CVB CITATION Nos: 9466907, 9466908

*RECEIVED & FILED CLERK'S OFFICE
OCT - 3 2023
US DISTRICT COURT
SAN JUAN, PR*

## MOTION TO DISMISS CITATIONS

COMES NOW, the Defendant, ANGEL URBINA ("Mr. Urbina"), represented by the Federal Public Defender by and through undersigned counsel, and respectfully submits his Motion to Dismiss the above-referenced Citations. In furtherance thereof, Mr. Urbina states as follows:

**I.   Background**

Mr. Angel Urbina (hereinafter "Mr. Urbina") is a sixty-four-year-old veteran of the Armed Forces who suffers from a variety of mental and physical afflictions. Some of these afflictions include chronic post-traumatic stress disorder ("PTSD"), chronic anxiety disorder, major depressive disorder, trigger finger, etc. He has a past psychiatric history and moreover, he was honorably discharged after seeing the aftermath of a man shooting himself in the head with an M-16 rifle. At the time, Mr. Urbina was working as a guard at an ammunition dumpsite in Germany as part of his offsite training. Hearing the gunshot and seeing the soldier's brain matter and what remained of his body on the floor haunts him. Mr. Urbina suffers from panic attacks, nightmares, and other PTSD symptoms. Additionally, Mr. Urbina suffers from back pain due to his service and an accident during

his post-service employment. He takes more than 15 pills a day for all his health conditions.

On September 6, 2022, while suffering from these afflictions, Mr. Urbina went to the pharmacy at the VA Hospital to obtain some medications.[1] Mr. Urbina was accompanied by his ex-uncle-in-law, Angel Merced Rivera (hereinafter "Mr. Merced"). He was allowed into the VA hospital without any issues as he was wearing a face shield over his cloth mask. While standing in line with Mr. Merced, two officers, PO Orlando Caldero and PO Daniel De Jesus, approached him and told him he had to wear a mask. Mr. Urbina responded that he was wearing a mask and that the mask he wore helped him not get dizzy or feel sick. At the time, Mr. Urbina wore a cloth mask over the lower part of his face and a clear face shield. The officers told him he had to wear a different mask. Mr. Urbina asked to use the restroom and the officers escorted him to the restroom. Afterwards, he was met with more officers and subsequently arrested.

After Mr. Urbina's arrest, he was issued citations for violations of 38 CFR 1.218(b)(11) and 38 CFR 1.218(b)(24), regulations governing behavior on Department of Veterans Affairs (hereinafter "VA") property. Title 38 CFR § 1.218(11) prohibits "disorderly conduct which creates loud, boisterous, and unusual noise … or which tends to impede or prevent the normal operation of a service …" Title 38 CFR § 1.218(b)(24) is "Failure to comply with traffic directions of VA police…"

This motion follows, and demonstrates dismissal is appropriate for the following reasons. First, Mr. Urbina, when confronted by the officers, expressed mere disagreement and misunderstanding, but this conduct is not sufficient to constitute a violation of Title

---

[1] Some of the medications he takes include pills for blood pressure (twice a day), anxiety (four times a day), depression (twice a day), sugar levels (twice a day), sinusitis (two pills in the morning and four at night); cholesterol (once daily); pain pills (two at night); and aspirin (twice a day).

2

38 CFR § 1.218(11). Second, the citation issued for Mr. Urbina's alleged violation of Title 38 CFR § 1.218(b)(24) is facially invalid and completely devoid of probable cause. Even if the court decides that the provision covers the violation alleged against Mr. Urbina, the court should easily find that Mr. Urbina complied with the VA's mask requirement.

## II.  Dismissal Pursuant to Rules 12(b)(1) and 12(b)(3)

Pursuant to Federal Rule of Criminal Procedure 12(b)(1), a party "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Rule 12(b)(1) has been interpreted to permit dismissal of a case where the facts presented by the government simply do not constitute the violation any statute or other regulatory device. *See United States v. Risk*, 843 F.2d 1059, 1060 (7th Cir. 1988) (the government's own facts proffered to the defendant and the district court simply did not conform to the allegations in the indictment. The district court found no violation and correctly dismissed the indictment, "not because the government could not prove its case, but because there was no case to prove"); *see also United States v. Levin,* 973 F.2d 463, 469-70 (6th Cir. 1992) (affirming district court's pretrial dismissal of the indictment where "the undisputed extrinsic evidence" showed that the defendants could not, as a matter of law, have formulated the necessary criminal intent); *United States v. Brayan Del Valle-Fuentes*, Case No.: 15-00347, Order Granting Motion to Dismiss (DE-42) (granting Motion to Dismiss based on documents and information provided by government in discovery and agreed to).

Applied to the case at bar, the summary dismissal mechanism gives this Court the authority to dismiss CVB citations, like Mr. Urbina's, that clearly lack sufficient support. This motion will cite to documents and other materials provided by the government in discovery, including sworn statements and VA policy.  Rule 12(b)(3) permits a defendant

3

to move to dismiss an indictment or other charging document that contains a defect, including where it fails "to state an offense". Rule 12(b)(3)(B)(v). For an offense to be stated sufficiently and be facially valid, an indictment must "sketch[ ] out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense." *United States v. Felix-Marqus*, 2015 WL 4663224 *1 (2015); *see also United States v. Guerrier,* 669 F.3d 1, 3 (1st Cir. 2011) (same).

### III. Argument and Authorities

**a. Mr. Urbina's response to officers who swarmed him does not rise to the level contemplated under the statute governing disorderly conduct.**

Title 38 CFR § 1.218(11) prohibits "disorderly conduct which creates loud, boisterous, and unusual noise … or which tends to impeded or prevent the normal operation of a service …" The conduct described in the investigation reports does not fall under the disorderly conduct provision. If it did, the provision would be void-for-vagueness. Unconstitutionally vague laws encourage arbitrary and discriminatory enforcement by giving government officials, in this case the VA officers, the sole ability to interpret and apply the scope of the law. *Greyned v. City of Rockford,* 408 U.S. 104, 108-09 (1972). Consequently, courts have stricken down the government's contention that, for example, a person of common intelligence would understand minor involvement in an altercation as conduct falling under a strained interpretation of a regulation's reach. *See United States v. Lanier,* 520 U.S. 259, 266 (1997); *see also United States v. Elliot, No. 2:17-CR-33-RWS, 2018 WL 11478272, at *2 (N.D. Ga. Aug. 8, 2018).*

In *United States v. Aggison,* for example, the Northern District of Georgia was asked to determine whether a civilian employee unreasonably obstructed the parking lot

4

at a VA Medical Center in violation of Title 38 CFR § 1.218(5), when she assaulted a visitor by hitting him in the face. *United States v. Aggison*, 2023 WL 2250313, at *1 (N.D. Ga. Feb. 27, 2023). The employee argued that the regulation failed to notify her that her conduct violated the statute, and that an ordinary person would not presume that her hitting a visitor would be considered conduct that "unreasonably obstructs" the "usual use" of a parking lot. *Id.* at *2. The court stated that if, "[i]f a criminal statute is ambiguous in its application to specific conduct, the rule of lenity requires that it be narrowly construed." *Id.* at *3. There, an ordinary person would not naturally assume that an isolated act involving assault would constitute as "unreasonable obstruction" of access to a parking lot and that the regulation's application of the terms "usual use" of the parking lot was exceedingly broad. *Id.* *5. Therefore, the court held that the federal regulation prohibiting conduct on VA property that unreasonably obstructed the usual use of parking lots, was void-for-vagueness because the charged conduct did not comport with the "everyday meaning" of the provision's terms. *Id.*

In Mr. Urbina's case, the Statement of Probable Cause alleges he "[d]isrupted the normal operation of the area by utilizing a loud tone of voice and refused to follow instructions." *See* Violation Notice PR-50, issued September 6, 2022, for violation of "1.218(b)(11)," attached hereto as Exhibit 1. There is no indication that Mr. Urbina was yelling, moving his body aggressively, or acting in a threatening, boisterous manner.

Like in *Aggison,* Mr. Urbina could not presume that simple disagreement with the officers as to the kind of mask he wore, would be considered conduct that "unreasonably obstructs" the "usual use" of the hospital. Nor could Mr. Urbina reasonably assume that his passive resistance would fall under the statute prohibiting boisterous conduct. Mr. Urbina expressing himself is his right under the Constitution's protection of freedom of

5

speech.[2] Also, the fact that Mr. Urbina was allowed to continue his business on VA premises after the encounter with the officers demonstrates that he did not impede the normal operation of the VA. Simply put, Mr. Urbina's actions cannot fall into the provision's definition of disorderly conduct because the scope of regulations such as CFR 1.218(b)(11) cannot be applied in such an exceedingly broad manner. The conduct alleged is insufficient to fall under the disorderly conduct provision.

### b. Due to his mental condition, Mr. Urbina lacked the *mens rea* and *actus rea* required to commit a violation of Title 38 CFR § 1.218(11).

Additionally, while Section 1.218(11) contains no *mens rea* requirement, that "does not mean that none exists." *Elonis v. United States*, --- U.S. ---, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015). The Supreme Court has "repeatedly held that 'mere omission from a criminal enactment of any mention of criminal intent' should not be read 'as dispensing with it.'" *Id*. at 2009 (citing *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal." *Id*. (citations omitted).

Where a statute is silent regarding *mens rea* courts impute a general intent requirement. *See, e.g.*, *United States v. Dean*, 367 Fed.Appx. 83 (2010). A general-intent crime is one in which an act was done "voluntarily and intentionally, and not because of mistake or accident. The term refers to whether a defendant intended deliberate, conscious, or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness…" 21 Am.Jur.2d Criminal Law § 118 (2015). In sum, a general intent crime requires the government prove an act was done knowingly and willfully. *See United States v. Lamson,* 993 F.2d 1540 (4th Cir. 1993) ("As

---

[2] U.S. Const. Amend. 1.

a general intent crime, [the offense] does require proof that the acts were done knowingly and willfully").

According to both the government and Mr. Urbina, on September 6, 2022, Mr. Urbina voluntarily appeared at the VA Hospital to pick up his medications. Again, Mr. Urbina is a veteran who is diagnosed with several conditions, including post-traumatic stress disorder and major depressive disorder. He also has a psychiatric history. While suffering from these afflictions Mr. Urbina allegedly engaged in "disorderly conduct" (according to government) after he was swarmed by officers. At that time, he could not fully understand or otherwise consciously grasp what was happening when VA personnel attempted to restrain him after he refused to wear a different mask than the one that he was wearing (which included a cloth covering the lower part of his face and a face shield).

Charging a mentally ill veteran with creating a "disturbance" inside the VA Hospital borders on the absurd, especially when he ventured there to receive assistance, and when he was indeed wearing a mask. Regardless, the citation also lacks a valid legal basis. One cannot knowingly and willfully engage in disorderly or otherwise disruptive behavior while failing to completely process and understand the instructions he was allegedly provided. The government's inability to prove the required *mens rea* warrants dismissal of Mr. Urbina's citation for violating 38 CFR 1.218(b)(11).

### c. The citation issued for Mr. Urbina's alleged violation of Title 38 CFR § 1.218(b)(24) is completely devoid of probable cause.

The second citation issued to Mr. Urbina alleges a violation of Title 38 CFR § 1.218(b)(24). *See* Violation Notice PR-50, issued September 6, 2022, for violation of "1.218(b)(24)," attached hereto as Exhibit 2. An individual violates that provision when they fail to comply with traffic directions of VA police. "The purpose of a CVB notice, like

7

a complaint, is to enable a magistrate judge to determine whether the probable cause required to support a warrant or summons exists." *United States v. Thomas*, 2013 WL 5783408 *1 (D. Ariz. 2013) (internal quotations and citations omitted). If probable cause does not exist, the complaint or CVB notice must be dismissed. *Id.* (citing *United States v. Hicks,* 2009 WL 256419 (D.Mont. Jan. 9, 2009) (because the violation notice did not set forth facts constituting an offense, the violation notice was dismissed)). [3]

The violation notice issued to Mr. Urbina dutifully references Title 38 CFR § 1.218(b)(24). *See* Violation Notice PR-50, issued September 6, 2022, for violation of "1.218(b)(24)," attached hereto as Exhibit 2. However, the attached "Statement of Probable Cause" indicates, "The person whose information appears in front according to my investigation and observation, Failed to Comply with Mandatory COVID-19 Face mask Policy. He refused to wear a face mask alleging that he was except to wear it." Investigative report 20220906-000681. The plain language of Title 38 CFR § 1.218(b)(24) specifically pertains to following traffic directives involving vehicles. *See Williams v. Young,* 769 F. Supp. 2d 594, 601 (S.D.N.Y. 2011) (court found officer had probable cause to detain a VA employee under the statute when the employee drove up the ramp at an excessive speed, struck the officer with is vehicle, and refused to exit the vehicle when directed to do so). The CFR provision does not apply to Mr. Urbina and the issued citation lacks probable cause and is ripe for dismissal pursuant to Rule 12(b)(3).

    d. **Even assuming the Title 38 CFR § 1.218(b)(24) citation includes an adequate statement of probable cause, Mr. Urbina complied with the mask requirement because he was in fact wearing a mask at the time of the incident.**

---

[3] Regardless of whether it is a complaint, violation notice, or application for a search warrant, "[t]he facts upon which the magistrate [judge] bases his probable cause determination must appear within the four corners of the [charging document or] warrant affidavit[.]" *United States v. Rubio,* 727 F.2d 786, 795 (9th Cir. 1983).

8

Mr. Urbina's 38 CFR § 1.218(b)(24) citation warrants dismissal for a second reason. Even assuming the statute applies to Mr. Urbina, he complied because he wore a mask. This is an undisputed fact. What the officers found at issue was that Mr. Urbina allegedly did not want to wear the specific mask they wanted him to wear. While the undersigned has been unable to locate a federal case governing 8 CFR § 1.218(b)(24) or defining "mask," the U.S. Department of Health and Human Services itself has referenced several kinds of masks. For example, in March 30, 2020, HHS released a notice of scarce or threatened materials that included, "PPE face masks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels"; "PPE surgical masks, including masks that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials"; and "PPE face shields, including those defined at 21 CFR 878.4040 and those intended for the same purpose." Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Prevention Measures, U.S. Dep't HHS, 85 FR 17592-01 (2020). If even an official agency such as HHS has several examples of what constitutes a "mask," an ordinary person reasonably would consider a cloth face cover and face shield as a "mask." Thus, Mr. Urbina wore a mask for purposes of the VA's regulations.

Not only did Mr. Urbina wear a mask in compliance with both instructions to wear a mask *and* the VA's regulations, but the mask that Mr. Urbina wore has proven to be protective against COVID-19.[4] In fact, the American Medical Association has stated that

---

[4] *See* Jin Pan, Charbel Harb, Weinan Leng & Linsey C. Marr, "Inward and outward effectiveness of cloth masks, a surgical mask, and a face shield, Aerosol Science and Technology", 55:6, 718-733 (2021), DOI: 10.1080/02786826.2021.1890687. "Cloth masks provide some degree of both source control and exposure reduction...A study involving particles generated by coughing human subjects reported an outward protection efficiency of 77% at a distance of 0.3 m from the source for a cloth mask, but only 4% for a face shield (Li, Niu, and Zhu 2021). Similarly, a study of outward protection efficiency using

9

adding layers or wearing two masks reduces the number of respiratory droplets containing the virus that has come through the mask, potentially decreasing infectious aerosols by 95%. Sara Berg, "What doctors wish patients knew about double masking, AMA (2021).[5] Again, Mr. Urbina wore a face shield over his cloth mask, an effective means of protection against the virus.

As part of discovery, the government provided a flyer discussing "Visitation Policy Rules," attached hereto as Exhibit 3. The flyer depicts an individual wearing a white face covering with two strings over the lower part of an individual's face.[6] The flyer urges in large font that an individual "WEAR MASK" and in small font states, "Visitors must wear a surgical mask at all times."[7] The common understanding of the image supports the common understanding of the Merriam-Webster definition of surgical mask. Merriam-Webster defines "surgical mask" as a "rectangular-shaped face mask (as of fabric or polypropylene fiber) that is typically secured by two straps tied in the back of head…" and also as a "face mask (such as a procedure mask) that resembles a surgical mask."[8] Another document provided by the government, attached hereto as Exhibit 4, details the VA policy requiring only that visitors "[w]ear a mask while in the facility." In the second page of that exhibit, the policy refers to CDC guidelines, writing only that visitors should "Use face mask" and that if they do not have a mask, to "[a]sk for a mask."[9] Again, no specific type

---

simulated coughs found that a three-ply cotton mask, single-layer polyester neck gaiter, double-layer polyester neck gaiter, and face shield blocked 51%, 47%, 60%, and 2% of particles, respectively."
[5] *Available at* https://www.ama-assn.org/delivering-care/public-health/what-doctors-wish-patients-knew-about-double-masking.
[6] *See* Exhibit 3.
[7] Exhibit 3.
[8] *Available at* https://www.merriam-webster.com/dictionary/surgical%20mask?src=search-dict-box
[9] *See* Exhibit 4.

of mask is specified and since Mr. Urbina was wearing a mask, he complied with VA's own directives.

Importantly, a study conducted by Cochrane, a British nonprofit that is well known for its reviews of health care data, found that there is no significant difference between the masks worn.[10] Mr. Urbina wore both a full-face shield and a cloth mask that covered the lower part of his face, meaning that he complied with the VA's policy and any instructions that he wear a mask. The way "mask" "face mask" and "surgical mask" is used interchangeably in the VA's own documents and official website, demonstrates the flexibility and broadness of the VA mask's requirement.[11] Nowhere in the citation, or regulation listed is there a clear and concise definition of the kind of mask was required. Instead, throughout the discovery provided by the government, which includes official documents, terms such as "disposable mask," "surgical mask," and simply "mask," are used interchangeably.[12] The Statement of Probable Cause states only that Mr. Urbina "[r]efused to wear a face mask alleging that he was except to wear it."[13] Thus, Mr. Urbina complied with the general requirement of wearing a mask in the VA.

When looking at the VA Policies page online, there is no mask requirement listed on the Visitation policy page.[14] A general search on masks leads to a page stating that masks are required in high-risk areas such as chemotherapy units, dialysis units, emergency departments, and post-transplants units. Additionally, individuals "can

---

[10] Bret Stephens, The Mask Mandates Did Nothing. Will Any lessons be Learned", The New York Times (2013). ("The conclusions were based on 78 randomized controlled trials, six of them during the Covid pandemic, with a total of 610,872 participants in multiple countries. And they track what has been widely observed in the United States: States with mask mandates fared no better against Covid than those without.")
[11] Exhibit 3-4.
[12] *See* Exhibit 3-4.
[13] Exhibit 2.
[14] *See* https://www.va.gov/caribbean-health-care/policies/#visitation-policy.

choose to wear a mask at any time."[15] Clearly, Mr. Urbina who *was* wearing a mask on September 6, 2022, complied with the VA Face Mask Policy.

### IV. Conclusion

Pursuant to Rule 12(b)(1), this Court has the authority to dismiss Central Violations Bureau citations where the facts, as proffered by the government, fail to demonstrate any violation actually occurred. The incident underlying this case is obviously unfortunate. With that said, imposing fines or other punishment on a veteran suffering from mental illness does little good. It musters even less purpose when one considers that Mr. Urbina sought assistance in the appropriate venue if he raised his tone, it was simply because his mental faculties failed him as his PTSD took over. Fortunately, the law does not target those who lack the required *mens rea* nor does the law target those who express their disagreement. Mr. Urbina was not acting in a deliberate or conscious manner at the time he created the "disturbance" and cannot be convicted of a violation of Title 38 CFR 1.218(b)(11) as a result. Regardless, Mr. Urbina complied with VA policy because he wore a mask as required and was allowed to continue his business after the encounter with officers. Dismissal is appropriate.

Additionally, as discussed above, Mr. Urbina did not violate Title 38 CFR 1.218(b)(24) both because that provision involves following traffic directives, which does not apply to Mr. Urbina, and because even if the court determines the charge of failing to comply to wear a mask applied to him under this provision, Mr. Urbina wore a mask at the time of the incident. He wore both a cloth mask and a face shield, which falls under the common understanding of the term "mask."

Under Rule 12(b)(3), this Court has the authority to dismiss citations that lack sufficient probable cause and fail to state an offense. Mr. Urbina's citation under 38 CFR

---

[15] *See* https://www.va.gov/coronavirus-veteran-frequently-asked-questions/.

§ 1.218(b)(24) certainly falls into this category. A cursory review of the violation notices and incorporated probable cause statements demonstrates the documents simply do not state a cause of action. Dismissal of this citation is also appropriate.

WHEREFORE, the Defendant, Angel Urbina, respectfully requests this Honorable Court enter an Order dismissing, with prejudice, CVB Citation No: 9466907 and No. 9466908.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 3rd day of October 2023.

Rachel Brill, Esq.
Federal Public Defender

*S/MaríaCarolina Gómez-González*
**MaríaCarolina Gómez-González**
USDC-PR G03715
241 F.D. Roosevelt Ave.
San Juan, PR 00918-2441
T: (787) 474-6394
F: (787) 281-4899
Email: Maria_Gomez@fd.org